# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| NANCY R. SCHILLI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 11 C 63 |
| v. | ) | |
| | ) | Judge Ronald A. Guzmán |
| HOSPIRA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Nancy Schilli has sued Hospira, Inc. for sex discrimination and retaliation in violation of Title VII (Counts I & II) and violations of the Illinois Wage Payment and Collection Act (Count III). Hospira has filed a motion pursuant to Federal Rule of Civil Procedure ("Rule") 56 for summary judgment. For the reasons set forth below, the Court denies the motion.

## Facts

Schilli started working for defendant's predecessor, Abbott Laboratories, in 1995. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 2.) In May 2004, Abbott's hospital products division became a separate company, defendant Hospira, and Schilli started her employment with it. (*Id.* ¶ 12.)

From 2005-2009, Schilli held a management position in Hospira's IT Department, supervising a group of Hospira employees and contractors. (*Id.* ¶ 14.) In September 2005, a contractor whom Schilli supervised, Michelle Ledain, complained to Hospira's Office of Ethics and Compliance ("OEC") that Schilli had treated her unprofessionally and used profanity towards her. (*Id.* ¶ 22.) Schilli's supervisor Cathy Skala, Hospira Human Resources ("HR") representative Angela Bochek and OEC representative Frank Taber investigated the complaint. (*Id.* ¶ 23.) They

recommended that Schilli be given a written reprimand for her "recurring use of profanity and abusive tone" and attend a management class. (Def.'s LR 56.1(a) Stmt., Ex. 5, Bochek Dep. Ex. 4, 10/13/05 Mem. from Taber, Ibarra-Martinez & Bochek to File at H322.)

On October 17, 2005, Skala gave Schilli a reprimand that said:

You have been previously coached during your 2004 Performance Assessment, to refrain from conduct or language that would be reasonably viewed by others as a non-productive work environment. While the frequency of demonstrated behavior has lessened, there have been reported recent occurrences of inappropriate language and/or an abusive tone used during some communications.

This memo is to advise you that further, continued behavior of this nature may require immediate and appropriate corrective action designed to stop the improper conduct and correct its effects. Responsive action may include, but is not limited to: training, referral to counseling and/or disciplinary actions such as warning, reprimand, withholding of promotion or pay increase, reassignment/demotion or termination of employment. Nancy, you are a valued member of my team, and I want you to be successful in correcting this behavior.

(Def.'s LR 56.1(a), Ex. 2, Schilli Dep. Ex. 11, 10/17/05 Letter from Skala to Schilli at H307.)

In April 2008, Kris Rao became plaintiff's supervisor. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 35.) Shortly thereafter, Rao hired Sharon Epps, a subordinate of Schilli's who was going to be removed from her team for unsatisfactory performance, as his administrative assistant. (Pl.'s App., Ex. 5, Andrews Dep. at 29-30.) Schilli says Rao refused to talk to her about Epps' transition and when she brought the issue up in a staff meeting, Rao "chid[ed] her" and "demeaned her in front of her peers." (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 10.)

Starting in May 2008, Diane Melnick, Teaza Cobb, Sue Madrigano and Rod Brushwood, contractors who currently or previously reported to Schilli, complained to Rao about her. (Def.'s LR 56.1(a) Stmt., Ex. 11, Rao Decl. ¶¶ 12-15.) Brushwood said, among other things, that Schilli had "conducted herself in a loud, demeaning, and belligerent manner" during one meeting, and he

2

had "heard [Schilli] yelling and, at rare instances, almost screaming while in meetings in her office, . . . . frequently us[ing] expletives." (*Id.*, Ex. 11, Rao Decl., Ex. 1, 8/6/08 Email from Brushwood to Rao at H77.) Cobb said Schilli had "treated [Cobb] without respect on occasion, yelled at [her] when [she made errors], belittled, [and] humiliated [her] before staff." (*Id.*, Ex. 11, Rao Decl., Ex. 2, Letter from Cobb to Rao at H80.) Melnick said Schilli "scream[ed] at [Melnick] and others, use[d] the "F" word in meetings . . . , [and] pound[ed] her fists on her desk in her office." (*Id.*, Ex. 12, Melnick Decl. ¶ 6.)

In June 2008, Schilli complained to OEC that Rao "cut her off, treated her inappropriately when she would try to discuss the [Sharon] Epps transition with him" and said she did not understand "why [he] was able to follow a different set of rules," and "got to treat women like this." (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 13) (quotation omitted). Schilli "also witnessed Rao being abrupt or curt to other female managers during staff meetings." (*Id.* ¶ 12.)

On August 29, 2009, Rao gave Schilli a "Final Warning" that states:

You have been previously coached during your 2004 Performance Assessment discussion and again in October 2005, as a result of an OEC compliant [sic], to refrain from conduct and use of language that could reasonably be viewed by others as inappropriate and/or abusive in tone thereby creating a non-productive work environment.

I have observed occasions when you have demonstrated unacceptable, unprofessional behavior during meetings as well as using an abusive tone when communicating with others. You have used argumentative, raised tones and slammed out of staff meetings. Additionally, I have been provided similar feedback from several others in the organization regarding your disrespectful communications including raised, abusive tone and the use of profanity.

Your continued pattern of unprofessional communications in the workplace is unacceptable and must be corrected immediately. . . .

Effective immediately you will be responsible for . . . :

3

> o Refraining from all use of inappropriate language and/or an abusive tone during communications.
>
> o Expressing ideas effectively in individual and group situations (including non-verbal communication) without showing frustration when asked to defend your ideas.
>
> . . . .
>
> o Refraining from physically expressing your frustration by walking out of meetings prior to the conclusion and/or by slamming doors when leaving a meeting and/or any such inappropriate behavior.
>
> . . . .
>
> . . . . This warning is final; any further violations will result in disciplinary action up to and including termination.

(Def.'s LR 56.1(a) Stmt., Ex. 2, Schilli Dep. Ex. 2, 8/28/08 Final Warning from Rao to Schilli at H365-66.)

When Rao gave her the warning, Schilli told him she thought he was retaliating against her for the OEC complaint she had lodged against him. (*Id.*, Ex. 2, Schilli Dep. at 252; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 57.) Rao says that was the first he heard about Schilli's complaint. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 62; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 23.)

Between August 29, 2008 and the end of 2008, no complaints were lodged against Schilli with Hospira's HR Department or OEC, though Rao says, in December 2008, Epps told him that Schilli had used abusive language toward her. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 33.)

In January 2009, when Hospira was under a hiring freeze, Rao posted an opening for a job called IT Asset and Vendor Management. (Def.'s Resp. Pl.'s LR 56.(b)(C)(3) Stmt. ¶ 31.) "Schilli expressed 'concern' to Rao because the [posted] position . . . looked 'an awful lot' like her job, and Rao assured her it was not." (*Id.*) (quotation omitted).

4

Sheri Rahn, a Hospira IT employee, applied for the posted position. (Pl.'s App., Ex. 7, Rahn Dep. at 16.) When she told Rao she had done so, however, he persuaded Rahn to withdraw her application. (*Id.* at 16-17.)

On January 29, 2009, Rao held a meeting with the managers he supervised, including Schilli, Keith Renouard and Leslie Wood, and HR representative Laura Montellano. (Def.'s LR 56.1(a) Stmt., Ex. 10, Decl. Montellano, ¶¶ 6-7; *id.*, Ex. 13, Wood Decl. ¶¶ 2-3, 7-9; *id.*, Ex. 15, Renouard Decl. ¶¶ 2-3.) According to Renouard, when Rao announced a headcount freeze, Schilli became "visibly agitated" and "rais[ed] her voice" to Rao, which "derailed the meeting, made [Renouard] uncomfortable, and was disrespectful of [Rao] and [Renouard's] peers." (*Id.*, Ex. 15, Renouard Decl. ¶¶ 3-6.) Wood also said Schilli became angry and "abruptly [left,] . . . slamming the door on her way out." (*Id.*, Ex. 13, Wood Decl. ¶ 9.) Montellano also said Schilli left abruptly, which Montellano thought was "disrespectful" both to Rao and to Schilli's peers. (*Id.*, Ex. 10, Montellano Decl. ¶¶ 6-7.)

On February 2, 2009, Diane Melnick, a contractor to whom Schilli had just given a low performance rating, told Rao that Schilli had behaved inappropriately to her during a meeting. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 34.)

On February 6, 2009, Rao fired Schilli. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 73.) His reasons for doing so were that:

> [She] had been previously coached during her 2004 Performance Assessment and again in October 2005, and again in July 2008 when she was put on final notice to refrain from conduct and language that would be reasonably viewed by others as a non-productive work environment. Based on feedback from her direct and indirect reports and peers, and based on my own personal observations, I can see that the frequency of unacceptable behavior and frequency of occurrences of use of abusive tone during communications has significantly increased again. Following incidents have led me to conclude the same:

5

1. An employee that reports to one of my direct reports approached Nancy requesting some information. Nancy used very abusive language and the person came crying to me with complain [sic]. This happened on December 12th 2008.

2. During the month of December 2008 and January 2009 I was told by several of her key work partners (including finance, HR, IT Operations) that they are having hard [sic] time working and communicating with her due to the tone she uses in her interaction with them.

3. During my last staff meeting held on January 29, 2009, she exhibited conduct that has been viewed by me and 2 of my direct reports as a non-productive work environment. She was adopting a tone of voice that was very inappropriately [sic] and was expressing her frustration the wrong way.

4. Yesterday, Feb [sic] 02, 2009, one of her direct reports came into my office with [sic] complaining about the way Nancy has been treating her in the past 3 weeks. Her complains [sic] was that Nancy makes her feel very low and insults her intelligence by raising [sic] voice and using abusive tone at her. She said that she gets beat up everyday and said her dignity is impacted.

(Def.'s LR 56.1(a) Stmt., Ex. 6, Rao Dep. Ex. 40 at H85.)

Rao said the "key work partners" referred to in the second paragraph were Laura Montellano, Mike Lynch and Ray Duncan. (*Id.*, Rao Dep. at 129-37.) However, Duncan testified that Schilli "[had] not act[ed] inappropriately in interactions or meetings with [him]," he had not seen her "act inappropriately with her staff," and he "[had] not hear[d] her use profanity" at work. (Pl.'s App., Ex. 14, Duncan Dec. ¶¶ 3-4.) Similarly, Lynch testified that:

> In my personal interactions with Nancy Schilli, including meetings in which she and I participated, she did not yell at or berate people or otherwise behave inappropriately. I found Ms. Schilli's style to be sometimes abrasive but also have encountered that same style with others. In my presence she never crossed the line to inappropriate.

(*Id.*, Ex. 17, Lynch Decl. ¶ 3.)

On February 12, 2009, when Hospira IT employee Mary Heckert told Rao that her husband was caring for their children, Rao said: "[K]ids are not the man's job," they are "the woman's job."

(Pl.'s App., Ex. 16, Heckert Decl. ¶¶ 2- 3.) Heckert reported Rao's comments to HR representative Montellano, who said: "I am aware of his issues and I'm coaching him." (*Id.* ¶ 5.)

In July 2009, Hospira hired a man, Joe Whitney, for the IT Asset and Vendor Management position Rao had posted in January. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 43.) Rao later told Montellano that Whitney took Schilli's former job. (*Id.* ¶ 45.)

**Discussion**

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

Schilli contends that there is sufficient direct evidence of both sex discrimination and retaliation to defeat Hospira's motion. *See Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003) ("Under the direct method [of proving Title VII retaliation], the plaintiff must present direct evidence of (1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two."); *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720-21 (7th Cir. 2005) (stating that direct evidence of discrimination includes evidence of suspicious timing or ambiguous comments that suggest bias, proof that defendant gave "systematically better treatment" to similarly situated employees outside of the protected class or evidence that plaintiff

7

was replaced by a someone outside the protected class for incredible reasons) (quotation omitted).

The Court agrees. Viewed favorably to Schilli, the record shows that: (1) in 2004, Hospira cautioned Schilli about her use of inappropriate language, and in November 2005, gave her a written reprimand for using profanity and using an abusive tone; (2) for the next two and one-half years, no complaints about Schilli were lodged with Hospira's OEC or HR Department; (3) in April 2008, Rao became Schilli's boss, and soon after, he says, Schilli's current and former subordinates complained to him about the tone and language she used; (4) in June 2008, Schilli complained to OEC that Rao was biased against women; (5) on August 29, 2008, Rao gave Schilli a "Final Warning," about her use of inappropriate language and tone, and Schilli told Rao she thought he was retaliating against her for her complaint to OEC about him; (6) between August 29, 2008 and January 2009, no complaints about Schilli were lodged with Hospira's OEC or HR Department; (7) in January 2009, when Hospira was under a hiring freeze, Rao posted a position that "looked an awful lot like [Schilli's] job," and convinced another female IT employee who applied for the job to withdraw her application; (8) on February 6, 2009, Rao fired Schilli for using improper language, citing: (a) a December 2008 complaint made by Sharon Epps, who had previously been removed from Schilli's team for poor performance, (b) December 2008 complaints about Schilli's abusive behavior by her peers Mike Lynch and Ray Duncan, each of whom denies having seen Schilli behave inappropriately at work, (c) Schilli's conduct during the January 29, 2009 meeting with Rao, Lynch and Duncan, and (d) a February 2, 2009 complaint made by Diane Melnick, one of Schilli's subordinates, immediately after Schilli gave her a low performance rating; (9) when Rahn told HR representative Montellano, shortly after Schilli was fired, that Rao had made sexist comments to her, Montellano said Hospira "was aware of [Rao's] issues"; and (10) Rao hired a man to replace Schilli. Taken

together, this evidence is sufficient to support the inference that Rao fired Schilli because of her sex or in retaliation for the discrimination complaint she made against him. Hospira's motion for summary judgment on Schilli's Title VII claims is, therefore, denied.

That leaves Schilli's Count III claim, that Hospira violated the Illinois Wage Payment and Collection Act ("IWPCA") by failing to pay her an award for 2008 under the Hospira Incentive Plan ("HIP"). The IWPCA requires employers to "pay the final compensation of separated employees in full . . . no . . . later than the next regularly scheduled payday for such employee," and defines "final compensation" as "wages, salaries, earned commissions, earned bonuses . . . and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 Ill. Comp. Stat. 115/2, 5.

The HIP states that a Participant shall be given an Award:

[In] an amount no greater than the sum of the Participant's . . . Corporate Performance Amount . . . plus . . . Business Unit Performance Amount . . . plus . . . Individual Goal Amount, based [on] such criteria or method designed with reference to [Hospira's, a Business Unit's and a Participant's] performance as the Plan Administrator shall have determined . . . for that Plan Year.

(Def.'s LR 56.1(a) Stmt., Ex. 10, Montellano Decl., Ex. D, HIP § 4.1.) An employee is a Participant if, among other things, she "is employed by [Hospira] both on the last day of the Plan Year and the Award Date," in this case, December 31, 2008 and February 13, 2009, respectively. (*See id.* §§ 2.1, 2.14, 3.1(b), 6.3; Def.'s LR 56.1(a) Stmt., Ex. 10, Montellano Decl., Ex. E, Hospira Incentive Plan - 2008 Administrative Summary at H0128.) Moreover, the HIP authorizes the Plan Administrator to issue rules for implementing the plan, one of which is that "[e]mployees who are terminated 'for cause' . . . prior to February 13, 2009" are not eligible for a payout. (*Id.*, Ex. 10, Montellano Decl., Ex. E, Hospira Incentive Plan - 2008 Administrative Summary at H0129.) Given the parties' dispute

9

over the circumstances of Schilli's termination, it is not clear whether she was terminated "for cause," and thus not entitled to an award for 2008. Accordingly, Hospira's motion for summary judgment on Count III is also denied.

## Conclusion

For the reasons set forth above, Hospira's motion for summary judgment [78] is denied. At the next status hearing, the Court will set dates for filing the final pretrial order and trial.

**SO ORDERED.**  **ENTER: October 24, 2012**

*[signature: Ronald A. Guzman]*

**HON. RONALD A. GUZMAN**
**United States District Judge**